We'll hear argument next in number 20-1513 DAK Americas LLC v. United States, Mr. Rosenthal. Thank you, Your Honor. May it please the Court, I am Paul Rosenthal on behalf of the Plaintiff's Appellate. This morning I'd like to address two main issues. First, I want to go straight to the question raised by this Court when you requested supplemental briefing on whether the letters by Customs and Border Protection to the domestic industry plaintiffs here are final agency action reviewable by the Court. And second, I'd like to address whether Customs has ignored its own regulations as well as the intent of Congress by pursuing payments to injured domestic companies many years after those payments were made. With respect to finality, there should be no question that the two prongs of the test for final agency action enunciated by the Supreme Court in Bennett v. Spears and adopted by this Court in Ashford University earlier this year are met in this case. The demand letters by Customs are the consummation of the agency's decision-making process and the action is one from which legal consequences will flow. The Ashford case, which we decided in February, involved a Veterans Administration letter which gave the plaintiff's educational institution an opportunity to correct deficiencies in its program. This Court found that the so-called pure letter did not satisfy the Bennett v. Spears first requirement because it was an intermediate step and a multi-step process that would lead to a final decision. Let's assume here that under Bennett the first requirement is satisfied, that it's the culmination of the agency's decision-making process. What are the legal consequences that flow from a demand letter? The consequences are, first, if it's not paid, interest will be accruing and the government has the right to do several follow-up actions, sue or begin proceedings to prevent these using other Customs privileges. Is the only legal consequence really that it starts the running of interest, in your view? No, because I don't see this as any different than the consequence enunciated by the Supreme Court in Abbott Labs v. Gardner, which found that an agency action was final when plaintiffs had a choice of compliance, which would require significant financial investment, or noncompliance, which would risk serious criminal or civil penalties. Here we are risking serious civil penalties and- Well, not as a result of the failure to comply with the demand letter. Well, Your Honor, by the way, the final agency action happens all the time when an agency issues a final rule and the courts don't say that you have to wait for the Justice Department, for example, in the Abbott Labs case to launch an enforcement action on the final agency rule. Enforcement is not the same thing as a final agency action that has legal consequences. A demand letter that is not responded to and not complied with has legal consequences. And in fact, in some respects, they're more onerous than waiting for the Customs Service or the Justice Department to sue my clients because here, as interest accrues, and we have no way to stop that, our risk gets greater. And in fact, it allows the agency to effectively punish my client by having the case go longer and longer and puts it at greater risk. If they don't comply, then they are going to be paying more. So there is an immediate consequence because you're at legal risk at that time. You don't need, and I don't believe I've seen any case that's at your appellate level that you actually happen to have to have an enforcement action in order to decide that the agency action is final with legal consequences. Mr. Rosenthal, this is Judge Toronto. Besides interest, is there a risk of penalty of some doubling or trebling or something that would properly be described as a penalty from... Yes. Well, the agency does have the ability to effectively stop these companies from exercising importing privileges as well. It doesn't threaten that in the letter, but that's one of the consequences of failing to pay your debt to the agency. So there are other things that the agency could do beyond simply imposing interest. But those aren't tied to the issuance of the demand letter. They're just tied to the failure to pay amounts due, right? They are. Yes, they are. Yes. But the demand letter is a demand to pay the amount to do. And again, if the standard in Bennett versus Spears is legal consequences flow, in terms of the penalties, there's no difference whether there was a demand letter or there wasn't a demand letter, right? Well, until the agency asserts its final determination, which it did, that you owe money, plaintiffs, and we are going to insist that you pay it with interest. And unless you do, you are at risk of an enforcement proceeding. That's a legal consequence. This is Joe Toronto again. It was surprising to me, and I'd like you to explain, maybe I'm just ignorant of this, but when the briefing came in, the supplemental briefing on this question, the amount of authority that was presented to us is tiny. And I would have thought that the government issues demand letters for payment all of the time. Why? What do I make of that? Should we be worried here about deeming this to be a final agency action because then all kinds of demand letters would be reviewable as final agency actions? Or is there something distinctive going on? Because, you know, a couple of district court cases that the government pointed us to seemed, I guess, was all the government really pointed us to. So can you help me understand what seems like a very common kind of thing for the government to do, and yet there being extremely little law on the final agency action issue raised by demand letters? Yes. By the way, one of the cases that the government cites, as well as the Smyrna case, which goes in the opposite direction, which says basically demand letter is a final agency action for these purposes. And that was distinguished in the bituminous opinion. Yes. So, but you're right, Your Honor, there is very little case law in this area, which surprised us as well. One thing that I will say distinguishes this case from the other cases involving demand letters is that, effectively, the government has already exhausted all of the alternatives that the government here says it might pursue. It has declined to, and it could not, use an administrative offset. And it's also, in this case, gone to the Treasury Department to get money out of the judgment fund to pay NANYA, the new affected domestic producer. So, there is nothing else that could be done other than to sue on this demand letter. And it's been very clear that that's the government's intent. We, again- So, if they do do that, then you can raise your arguments in response to that, right? Yes. And we tried to get, Your Honor, we filed a protest, even though it's not clear this is a protestable levy or exaction, the government ignored that as well. What we don't want to do, and I think it's unfair to ask, given the circumstances of all the other remedies having been pursued already by the agency, is to wait, which could be years, while interest accrues and be at risk for additional payments. And again, it is not any different than a situation that was in the Abbott Labs case. Can I ask this? Would a government collection action be filed in the CIT or in some other form? It would normally be in the CIT. Okay, so we're not faced with a situation where the first mover can change the form? No, I'm not aware of anything like that, and that certainly wasn't the intention here. My expectation would be the case would be filed at the CIT through our collection action. And I understand the concern about, does every run-of-the-mill demand letter generate litigation? And my answer is no for the reasons I've stated. And one of those reasons as to why every demand letter wouldn't be reviewable under your theory? Because in this instance, the agency has already declined to use the other options available to it, administrative offset, and has already had the money paid from the Treasury under the judgment fund to satisfy itself. There's nothing else it could do here other than sue to collect and have interest accrue in the meantime. Okay, we've consumed a lot of your time with this finality issue. We'll give you a couple of minutes to address the merits. And the question there seems to be, assuming that this regulation is inapplicable to this government still has a right and perhaps an obligation to sue to recover the money apart from the regulation, right? No, it has no right or obligation beyond what the regulation allows. It's axiomatic that agencies are bound by their own regulations. And in this instance, they said we are only going to have an exception to finality if one or two situations is met. One is the situation that is enunciated in the regulation under subsections B2 and 3, and the other one has to do with a affected domestic producer asking for a recalculation of the duties. Otherwise, everything is supposed to be final. And there's a very good reason for that. Suppose for a moment, hypothetically, that we construe the regulation as being inapplicable to this situation, that it's only applicable in the situation where there's an issue as to whether the importer has overpaid or underpaid duty and the effect of that on the Burt Amendment distribution. If the regulation is inapplicable, the government has a right to sue to collect overpayments just as a general matter under the Supreme Court cases, right? No, it does not, Your Honor. The agency has bound itself... No, no, no, you're not addressing my question. My question is, let's assume the regulation doesn't apply. I'm sorry. I thought you meant the regulation, the exception to the finality part of the regulation. The whole regulation doesn't apply. The government can sue to recover, right? If the regulation doesn't apply, yes, the government can sue to recover. And... But with all respect, there's no way to see how this regulation, which goes to the heart of what this statute is all about. The statute is very clear that it's intended to benefit domestic industries who've been injured. And if you go and even look at one of the cases cited by the government and looking at the Shea-Sydney and other cases involving whether you can get clawback, the Canadian Lumber 2 case, again, is a CIT case, not binding on you, but the court declined to seek recoupment there. Quote, when the government grants or distributes money to parties, those parties have some right to rely on that money they receive. After a constant threat of disgorgement, recipients might be loathed to expend money for the purpose for which it was given, fearing that they could not repay the money in the event of a court order. This would, in turn, frustrate congressional intent in granting money. And the reason why this finality provision is there is to prevent the intent of Congress to be thwarted by having the government go back and say, anytime we want to, we can take that money back. So there's a reason why that regulation is there. Had it not been there, the Congress would have been very upset with the drafting of those regulations and the application of them. And I don't remember, but was there a Federal Register regulatory history that elaborated in an informative way on that language of, what is it, subsection F, with the peculiar language, final and conclusive on the affected party? Your Honor, it sounds like it's my rebuttal time, but let me answer this question. The Federal Register notice came out and said, we want to make sure that affected domestic producers get paid promptly. And so we're going to do that and get that money out the door, but we're going to subject affected domestic producers to have to repay in those instances when it turns out that there's liquidations ordered by customs or reliquidations ordered by the court. That's the exception to that finality rule. So they made it very clear that all distributions will be final, except for that one situation that they've laid out in the Federal Register as the purpose for adopting this regulation. So I would say, yes, the finality regulation, it goes to the heart of implementing this statute. Unless my colleagues have further questions, I think we're... Thank you. Okay. Hearing none, we'll give you two minutes for rebuttal. Thank you. Ms. Coté? Yes, Mickey Coté for the United States. May it please the court, we respectfully request that the court remand this case with instructions that the trial or court dismiss this case as non-justiciable because customs issuance of demand letters to DAC and ERICA do not constitute final agency action. How come you didn't raise that issue earlier in the case? Quite frankly, Your Honor, I did not think of that issue earlier in the case. Initially, we moved to dismiss this case for failure to state a claim on other grounds. And I apologize to the court for not even having considered making this argument. However, as a direct result of the court's request that the parties submit supplemental briefing on the issue, we have definitely concluded, based upon the law that we have reviewed, that the issuance of demand letters did not constitute final agency action here. How many demand letters does the government issue every year? Do we have any sense of that? I mean, are we talking about millions of them? I, Your Honor, I can't fathom a guess on this. I have been practicing in this practice, trade and customs practice, for 26 years. This represents the first case that I've ever handled where there has been a challenge to the issuance of the demand. Customs issues demands in connection with penalties. There are no challenges to the demands in connection with penalties. In fact, after the agency or after a defendant, later defendant, importer does not pay, the statute provides for customs to file an action, a penalty action, against the importer. And within the context of that action, all issues relating to the assessment of the penalty are determined by the court or reviewable by the court. Is the penalty more than pay us what you owe us interest? Well, I'm speaking in a different context right now, Your Honor, and that's with respect to just demands per se. But to address that particular question, this is not a penalty case. The demands issued here were only demands for the amounts of the overpayment. And as per the regulations, if the amounts were not repaid, interest would begin accruing at 3% after 30 days. Can I ask you this question? So you say, I think at page 20 of your brief, not only does the United States have the authority under Supreme Court case works and other cases as well to seek return of the overpayment, but you say the United States has the duty to do so. So what practical issue should we be thinking about? You say you have the duty to seek the money. You say the decision is utterly final. You have an exact dollar amount. Why should this suit not proceed in the very same form? There's not even a choice of form issue. There seems something very odd about worrying about final agency action in this particular circumstance where the Justice Department has said you have a duty to go and get the money in the same form. So may I respond, Your Honor? Yes, please do. Okay. I'll start with forum. In the event that Customs makes a determination to refer this case to the Department of Justice, this case would not be handled by the Court of International Trade. It would be handled by a district court. Under what statute? I don't know the statute for district court, Your Honor, but I do know that under Section or 28 USC Section 1582, which deals with civil actions commenced by the United States in the Court of International Trade, this kind of collection action would not fall within the scope of the court's jurisdiction. Therefore, the United States can't bring this collection action to the CIT. It would have to pursue this action in a district court. And I don't have this in front of me, but this would not fall under 191592? Section 15 or 19 USC Section 1592 is a penalty action, and that involves negligence, gross negligence, and fraud in connection with the importation of merchandise. This doesn't fall within the scope of that. That penalty actions are covered by Section 1582. Suits against sureties who fail to pay duties that they've bonded fall within the scope of Section 1582 because the United States would then have to sue the sureties. So your view is that if this suit is dismissed and you fulfill your declared duty to go and get the money, you're going to go to a district court and presumably to a regional circuit to have the issues about the interpretation of the regulation under the CDSOA hashed out? If the agency makes a determination to refer a collection action against DAC and ARECA to the Department of Justice, the Department of Justice has an independent obligation to make a determination as to whether or not to commence such litigation. If the Department of Justice determined to commence such litigation, it would then file suit in the appropriate district court. And I apologize to the court because we are not there yet. The only thing that has occurred here is that customs has followed the regulations promulgated under the CDSOA. The regulations expressly notify the ADPs that in the event of an overpayment, customs will seek to collect the overpayment from them. Right, but now you're arguing about the interpretive question of the regulation, which I just want to assume for these purposes is actually a genuine debate about the scope of the regulation and then maybe not so much a debate about the authority to go seek overpayment if the regulation is simply inapplicable. Can I ask you a different question about final agency action? Yes, Your Honor. Is that a question that is jurisdictional in the particular sense that we are obliged to address it even though you did not present it as a defense? Does the government have a position about that? My general understanding is that we have not treated that as a final agent as jurisdictional, but maybe the circuits have different views about that. Do you have any sense of that? I do not. What I was going to say earlier with respect to the regulation had more to do with final agency action than the second part of this case, which is the trial court's judgment. What I was going to say is that the rights and obligations were determined within customs regulations. This is really important to me, so I think I am just going to ask it a second time. Do you have a view about whether we are obliged, sua sponte, to decide whether there is final agency action here? I believe that this is jurisdictional, and I believe that jurisdiction is never waived, and I believe that the court may, sua sponte, make a determination that this is non-justiciable because there is no final agency action. Indeed, what has happened here... Counsel, this is Judge Stoll. I just want to ask. I understand your answer to that question, but just to confirm, you do not have any cases to cite to us or anything for that position, right? I apologize, Your Honor. No, I do not. I think the Ashford case specifically reserved the question of whether the finality requirement is jurisdictional or not. Correct. Well, I think in that Ashford case, that was a direct appeal. There was no trial decision, I believe, and so the court could make that determination, if I recall correctly. So it is a slightly different circumstance here. So that was the VA case. Right, but Ashford, among other things, cited automated radio, which was a case from the Eastern District of Virginia, so that actually was a court case. And in both of those, we went on to decide the question, the final agency action question, and therefore, because we were deciding it, we did not have to decide if we were obliged to decide it, which I think maybe is an issue here, if any of us would be tempted to not want to decide it, because you didn't raise it. Correct. We did not raise it, Your Honor. That is a fact. So on the merits piece of it, what is the basis for, let's assume for a moment, and I realize you disagree with this and have reasonable grounds to disagree, let's assume for a minute that B3 is tied in the regulation to B2, so that even B3 is only about the shrinking of the pot for distribution and not about the increase of the number of claimants on the fixed pot. And we have the latter case, right, where suddenly there's a new claimant in this fixed pot as opposed to withdrawal of some of the money in the pot because one of the importers turned out to have overpaid. Assuming that B3 is not applicable, then why doesn't the last clause of F express regulatory intent that the money shall not come back, be taken back by the government in this situation? Okay. Customs cannot bind the government, the United States, in that way. Only Congress can make that determination, which is what Congress did in connection with 19 U.S.C. Section 1514, where it explicitly made a determination as to final and conclusive language in connection with the liquidation and reliquidation of importation. And it expressly, Congress expressly provided that the liquidations were final as to all parties, including the United States. Congress has the authority to do that. An agency does not. Here, as the administrator of the CDSOA, customs could only bind the ADPs and other relevant parties, not the United States. So just to make sure I understand, I'm understanding what you're saying to be that even though commerce or customs here that promulgated the regulation? I apologize. I may have said commerce, but I meant to say customs. Okay. So that when customs was promulgating the regulation under the authority of CDSOA, it could not have decided to make conclusive the distribution of money that turns out by later events to have been too high a distribution. That would have been outside the congressional authorization of regulatory authority. That is our position. Okay. The CDSOA is silent on that, but that is not something that customs could have taken upon themselves to do. And particularly... But I guess, assuming that customs did have the authority, does the regulation deal with that situation and purport to say that the United States can't recover the overpayment back? The regulation does not restrict the customs from attempting to recover erroneous distributions. If I may, the government has not attempted to collect any monies from DAC and ARIGA. I just wanted to clarify that. The government has not exhausted any other alternatives. I want to that for the record, Your Honors. They pursued no collection. They pursued no offsets. All that customs has done in this instance is to issue demand letters that provide notice that customs believes that the overpayments were made. And the next step here would be to that determination. A referral for collection would be a final agency action of sorts. But even then, Your Honors, the determination as to whether or not to pursue the action in court would be made by the Department of Justice. And then... Are you suggesting the decision to refer the action of the Department of Justice is reviewable final agency action? No. Where I was going with that, Your Honor, is actually quite the contrary. What I was going to say is that that's even closer to a final agency action than this. However, the actual action that would affect DAC and ARIGA would be the actual filing of a collection action in court. And then the court would determine whether or not the United States was entitled to reimbursement. And the court would determine in making this determination whether or not DAC and ARIGA are required to pay interest, which is just the regular assessment of interest and make the determination as to whether or not the United States is entitled to its dollar amount, its current dollar amount. And in conclusion, Your Honors, I will say this. The CDSOA permits Customs to either provide full distributions for qualifying expenditures when there's enough money in the special fund to do so, or when there is not, to provide pro rata distributions. Customs provided pro rata distributions, and as a result of a C-shift in the law, had to include an additional ADP. The regulations, the federal registered notices, put these ADPs on notice of the consequences of CDSOA. However, they will not, even though they chose to participate and receive benefits, not fulfill their obligations to repay. Okay. Thank you, Ms. Cote. Thank you, Your Honor. Mr. Rosenthal, you have two minutes. Thank you, Your Honor. Regarding the jurisdiction for collection, 28 U.S.C. 1582 requires the government to go to the CIT to collect on Customs duties. And there's been a CIT decision in 2011, the American Furniture Brand International case, which basically says that it has exclusive jurisdiction over CDSOA in regards to CDSOA as involving Customs duties as well. What's the citation of that, please? Even just the name. The Furniture Brand International case is 807 FEDSUP 2nd 1301, Court of Intractable Trade 2011. Okay. Thank you. Thank you. Your Honor, the last thing I'm going to say is that there is a reason for a finality provision in the regulation, and that is to prevent a disgorgement of funds that were supposed to be used to invest, rehire, and accomplish the other objectives to help injured domestic industries, to suggest that the regulation that Customs put in to implement the purposes of the law would not apply in this circumstance has no basis. I guess the problem that I have with that is that what you just said seems like something one could say about a very, very wide range of statutory authorizations to pay out money. It's for the benefit of the recipients. And yet, it can turn out that too much was paid, and maybe even turn out that too much was paid based on later facts. And I'm not sure why that would change anything. Well, but that's the reason why the law has statute of limitations. That's why the agencies have statute of limitations. That's why the law prevents reliquidations after a certain amount of time because it wants to have certainty. So there are many reasons in the law for certainty, many reasons in the law to say, at some point, we're not going to allow the government to change its mind and come after you. That's a very common thing, and it's especially important in this context. Thank you. Okay. Thank you, Mr. Rosenthal. Thank you, Ms. Pate. The case is submitted. The Honorable Court is adjourned until tomorrow morning at 10 a.m.